## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MICHIGAN IMMIGRANT RIGHTS
CENTER, DR. GEOFFREY ALAN
BOYCE, DR. ELIZABETH
OGLESBY, and AMERICAN CIVIL
LIBERTIES UNION OF MICHIGAN,

     Plaintiffs,

vs.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY and
UNITED STATES CUSTOMS AND
BORDER PROTECTION,

     Defendants.

Case No.

Hon.

Mag. J.

## COMPLAINT

### INTRODUCTION

1.    This case concerns the public's right to know about United States Customs and Border Protection ("CBP") policies and practices that treat the entire state of Michigan as a "border zone."

2.    Federal law authorizes CBP agents to conduct certain warrantless searches of vehicles "within a reasonable distance from any external boundary of the United States . . . for the purpose of patrolling the border to prevent the illegal entry" of non-citizens. 8 U.S.C. § 1357(a)(3).

1

3.    The relevant regulations provide that CBP can determine what a "reasonable distance" is based on local factors, but that the distance shall not be more than 100 air miles from an international boundary. 8 C.F.R. § 287.1(b). That maximum distance is called the "100 mile zone."

4.    In Michigan, CBP has not only set the "reasonable distance" for the entire state at the maximum 100 miles, but also considers the entire state to be within 100 miles of an international boundary, and hence within the "100 mile zone."

5.    Under this interpretation, CBP agents patrolling the "border" could potentially subject anyone in Michigan – regardless of where he or she is within the state – to warrantless detention and search.

6.    In order for the public, policymakers and the courts to evaluate the proper scope of warrantless searches conducted by CBP and to examine whether it is "reasonable" for CBP to define the entire state of Michigan as a border zone, it is critical that more information be made publicly available about CBP's extensive but largely opaque interior enforcement operations in Michigan, and particularly about CBP's interpretation and application of its authority within the "100 mile zone."

7.    On May 21, 2015—over 18 months ago—Plaintiffs Michigan Immigrant Rights Center ("MIRC"), Dr. Geoffrey Alan Boyce, Dr. Elizabeth

Oglesby and American Civil Liberties Union of Michigan ("ACLU") (collectively "Plaintiffs" or "Requestors") submitted a request to CBP under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking records related to U.S. Border Patrol's interior enforcement operations in the Detroit Sector[1] for Fiscal Years 2012 through 2014. The records that Plaintiffs seek include relevant agency policies, stop and detention records, apprehension logs, and complaint records. A true and correct copy of the FOIA request is attached hereto as Exhibit A, and thereby incorporated by reference.

8.      To date, and long past the statutory deadline to respond, Defendants have failed to provide a legally adequate response to Plaintiffs' request for records, necessitating this action under FOIA, 5 U.S.C. § 552, for declaratory, injunctive and other appropriate relief.

9.      The only documents that Defendants have released to date – heavily redacted Border Patrol apprehension logs – highlight how much is unknown and why public access to the requested records is so important, particularly given the current national conversation about immigration enforcement.

10.     Data culled from those logs shows that in the Detroit Sector:

---

[1] For comparison purposes, Plaintiffs also seek some records from the Buffalo and Tucson sectors. The Detroit sector includes Michigan and parts of Ohio.

3

- 31 percent of people processed by Border Patrol for whom citizenship is recorded – almost one in three – are United States citizens;

- Almost 40 percent of people processed are either U.S. citizens or foreign citizens lawfully in the United States.

- Less than 2 percent of foreign citizens processed are listed as having a criminal record;

- Just over 5 percent of foreign citizens processed are recent border crossers who arrived in the United States during the preceding 30 days; and

- Over 63% of those apprehended were initially stopped by other agencies, like local police.

11.   Without a full response to Plaintiffs' FOIA request, important questions will remain unanswered, including:

- Where Border Patrol stops are occurring in Michigan and how far they are from an international border;

- Why Border Patrol is processing so many United States citizens and so many people who are lawfully in the United States;

- What percentage of all stops and what percentage of U.S. citizen stops are of people of color, and what policies or procedure Border Patrol has to prevent racial profiling;

- Whether recent border crossers came in through the U.S.-Canada border (which Border Patrol in the Detroit sector is supposed to protect) or the southern border; and

- Which other agencies are calling in Border Patrol, the reason those agencies are calling Border Patrol, and how often those other agencies detain United States citizens and other people who are legally in the United States in order to call in Border Patrol.

12.     Through this lawsuit, Plaintiffs seek the immediate processing and release of agency records that should have been provided in response to the FOIA request properly made by Plaintiffs but that were improperly withheld by Defendants United States Department of Homeland Security ("DHS") and U.S. Customs and Border Protection ("CBP").

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 552(a)(4)(B) and 5 U.S.C. §§ 701-706.

14.     Venue lies in this district under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e) because Plaintiff American Civil Liberties Union of Michigan has its principal place of business in Detroit, Michigan.

15.     Plaintiffs have exhausted all available administrative remedies in connection with their FOIA request.

## PARTIES

16.    Plaintiff Michigan Immigrant Rights Center is a legal resource center for Michigan's immigrant communities. MIRC's mission is to build a thriving Michigan where immigrant communities are fully integrated and respected. MIRC fulfills this mission in various ways including the provision of education and training about immigration law, leading systematic advocacy to advance the rights of low-income immigrants and their families, and promoting respect and understanding among immigrants and receiving communities.

17.    MIRC disseminates information about government policies and practices affecting immigrants via a variety of media including its website, social media and an email newsletter service.  The MIRC website (michiganimmigrant. org) provides extensive information about immigration-related issues.  The website includes a library of materials used by community advocates, including a database of documents previously obtained through FOIA from Immigration and Customs Enforcement.

18.    Dr. Geoffrey Alan Boyce is a National Science Foundation Postdoctoral Research Fellow at the School of Geography and Development, at the University of Arizona, which is an educational institution. He has conducted research supported by the National Science Foundation, the Tinker Foundation, the ConfluenCenter for Creative Inquiry, and the University of Arizona Social and

Behavioral Sciences Research Institute. His research work has covered a number of topics, including international relations, transnational migration and U.S. immigration policy. He has had peer-reviewed work published in scholarly journals including: Geopolitics; Area; Territory, Politics and Governance; Environment and Planning D; as well as the University of Georgia Press. Dr. Boyce has professional training in qualitative and mixed-methods research; statistical data analysis; and Geographic Information Systems (GIS).

19.    Dr. Elizabeth Oglesby is an Associate Professor in the School of Geography and Development and the Center for Latin American Studies at the University of Arizona, which is an educational institution. Dr. Oglesby's research focuses on issues related to immigration, globalization and labor, human rights, and Central America. Dr. Oglesby has published peer-reviewed work in a number of scholarly venues including Environment and Planning D; Space and Polity; Geoforum; and Duke University Press. Dr. Oglesby has also served as editor of the Central America Report, a weekly bulletin of economic and political news analysis published by Inforpress Centroamericana in Guatemala City; an associate editor for the NACLA Report on the Americas, the largest circulating English-language publication of Latin American affairs; and a correspondent for Latinamerica Press, a hemispheric news service based in Lima, Peru.

20.     Plaintiff American Civil Liberties Union of Michigan is a non-profit, non-partisan 26 U.S.C. § 501(c)(4) organization dedicated to protecting civil liberties and human rights in Michigan. The ACLU is committed to ensuring that fundamental constitutional protections of due process and equal protection are extended to every person, regardless of citizenship or immigration status, and that the government respects civil rights. The American Civil Liberties Union of Michigan, which has thousands of members and supporters in Michigan, is the state affiliate organization of the national American Civil Liberties Union ("National ACLU").

21.     Dissemination of information to the public about actual or alleged government activity is a critical and substantial component of the ACLU's mission and work.  Specifically, the ACLU publishes blogs, reports, fact sheets, news briefings, "Know Your Rights" documents and other educational and informational materials that are designed to educate the public about civil liberties issues and governmental policies that implicate civil rights and civil liberties.  These ACLU publications often include descriptions and analyses of information obtained from the government through FOIA requests. These publications are widely available to the public for no cost or for a nominal fee. The websites of the ACLU of Michigan (aclumich.org) and the National ACLU (aclu.org) address civil rights and civil

liberties issues in depth and contain many thousands of documents relating to the issues on which the ACLU is focused.

22.     Defendant United States Department of Homeland Security ("DHS") is a Department of the Executive Branch of the United States Government. DHS is an "agency" within the meaning of 5 U.S.C. § 552(f)(1). DHS includes United States Customs & Border Protection. DHS has possession and control over the records sought by Plaintiffs. DHS is headquartered in Washington, D.C.

23.     Defendant United States Customs and Border Protection ("CBP") is an agency of the United States Department of Homeland Security. CBP is an "agency" within the meaning of 5 U.S.C. § 552(f)(1). It is headquartered in Washington D.C., and has field offices throughout the country. United States Border Patrol, which has responsibility for securing the borders of the United States, is a sub-agency within CBP. CBP and/or Border Patrol has possession and control over the records sought by Plaintiffs.

## FACTUAL BACKGROUND REGARDING BORDER PATROL OPERATIONS

24.     Border Patrol's interior enforcement operations are a matter of pressing public concern. Since 2006, the U.S. Border Patrol has nearly doubled in

size, from approximately 12,000 agents to over 21,000 today.[2] The budget for U.S. Customs and Border Protection, of which Border Patrol is a sub-agency, has more than doubled from $6.4 billion in Fiscal Year ("FY") 2005 to $13.9 billion in FY 2017.[3] In particular, Border Patrol's Detroit Sector has grown from 38 agents in FY 2001 to 411 agents in FY 2015 – a 981 percent increase, the fastest rate of growth of any Border Patrol sector in the United States during the same time period.[4] As the agency has expanded, complaints of Border Patrol abuses in the Great Lakes region,[5] and throughout the nation,[6] have increased.

---

[2] DEP'T OF HOMELAND SEC., FY 2017 BUDGET IN BRIEF 4 (2016) https://www.dhs.gov/sites/default/files/publications/FY2017BIB.pdf  (last visited Nov. 16, 2016).

[3] *See* DEP'T OF HOMELAND SEC., FY 2006 BUDGET IN BRIEF 15 (2006) https://www.dhs.gov/sites/default/files/publications/Budget_BIB-FY2006.pdf (last visited Sept. 22, 2016); DEP'T OF HOMELAND SEC., FY 2017 BUDGET IN BRIEF 10 (2016) https://www.dhs.gov/sites/default/files/publications/FY2017_BIB-MASTER.pdf (last visited Nov. 16, 2016).

[4] *See* UNITED STATES BORDER PATROL BORDER PATROL AGENT STAFFING BY FISCAL YEAR (2015), *available at* https://www.cbp.gov/sites/default/files/documents/BP%20Staffing%20FY1992-FY2015.pdf (last visited Nov. 16, 2016).

[5] *See Hebshi v. United States*, 12 F. Supp. 3d 1036 (E.D. Mich. 2014) (alleging, inter alia, discrimination based on race, ethnicity, or national origin by CBP at the Detroit airport); Jenna Greene, *In Human Rights Suits, Activists Target Border Protection Agency*, NAT'L L.J., March 13, 2013, http://www.cardozo.yu.edu/sites/default/files/In%20Human%20Rights%20Suit,%20Activists%20Target%20Border%20Protection%20Agency.pdf; FAMILIES FOR FREEDOM, UNCOVERING USBP: BONUS PROGRAMS FOR UNITED

25.     The scope of Border Patrol's interior enforcement operations is defined by federal statute and regulations, as interpreted by the federal courts.

26.     By statute, Border Patrol has authority to conduct certain warrantless searches "for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." 8 U.S.C. § 1357(a)(3).

27.     The statute also provides that such searches may be conducted within "a reasonable distance" of the border. *See id.*

---

STATES BORDER PATROL AGENTS AND THE ARREST OF LAWFULLY PRESENT INDIVIDUALS, (Jan. 2013), *available at* http://familiesforfreedom.org/sites/default/files/resources/Uncovering%20USBP-FFF%20Report%202013.pdf.

[6] From 2011-2014, complaints involving CBP received by the DHS Office of Civil Liberties and Civil Rights increased by nearly fifty percent. *See* DEP'T OF HOMELAND SEC., OFFICE OF CIVIL RIGHTS AND CIVIL LIBERTIES, "DEPARTMENT-WIDE DATA ON COMPLAINTS RECEIVED," *available at* www.dhs.gov/department-wide-data-complaints-received (last visited Nov. 16, 2016). Given the many problems with the DHS complaint system, it is likely that incidents of abuse are substantially under-reported. *See, e.g.*, U.S. GOVERNMENT ACCOUNTABILILTY OFFICE, REPORT TO CONGRESSIONAL REQUESTERS, IMMIGRATION DETENTION: ADDITIONAL ACTIONS COULD STRENGTHEN DHS EFFORTS TO ADDRESS SEXUAL ABUSE, GAO-14-38 at *3(Nov. 2013), *available at* http://gao.gov/assets/660/659145.pdf (last visited Nov. 16, 2016).

28.     That distance is defined by decades-old administrative regulations to be a maximum of "100 air miles" from any external boundary.[7] *See* 8 C.F.R. § 287.1(b).

29.     Under the regulations, CBP may fix a shorter distance based on local factors, such as topography and population density. *Id.*

30.     A map prepared by CBP and obtained by Plaintiffs shows that CBP uses 100 miles as the "reasonable distance" everywhere in the state. The map also shows that CBP considers the entire state of Michigan to be within the 100-mile zone. That map is reproduced below.

---

[7] *See United States v. Brignoni-Ponce*, 422 U.S. 873, 882–883 (1975) ("The only formal limitation on that discretion [to stop vehicles] appears to be the administrative regulation defining the term 'reasonable distance' in § 287(a)(3)  to mean within 100 air miles from the border.").



FUNCTIONAL EQUIVALENT U.S. BORDER: 100 AM ZONE

31.

Legend:

—— U.S. BORDER

—— FUNCTIONAL EQUIVALENT BORDER

100 AIR MILE ZONE

32.     Based on the map, it appears CBP believes that no warrant is needed for Border Patrol agents to detain and search vehicles anywhere in the state.

33.      Very little information is publicly available regarding Defendants' application of the 100-mile zone within Michigan, or the extent to which Border Patrol is conducting warrantless searches and seizures far from Michigan's border with Canada.

34.     Indeed, very little information is publicly available regarding the extent or impact of Border Patrol interior enforcement operations anywhere in the country. For example, over the past five years neither Border Patrol nor DHS has disclosed the total number or location of Border Patrol interior checkpoints.[8] The Government Accountability Office ("GAO") has described numerous problems with Border Patrol's internal monitoring of checkpoint operations, including "information gaps and reporting issues [that] have hindered public accountability, and inconsistent data collection and entry [that] have hindered management's ability to monitor the need for program improvement."[9]

––––––––––––––––––––

[8] *The Arizona Republic* estimated several years ago that there are approximately 170 Border Patrol checkpoints nationwide. *See* Bob Ortega, *Some in Town to Monitor Border Patrol Checkpoint*, Ariz. REP., Feb. 26, 2014, *available at* http://bit.ly/N3QTfu.

[9] U.S. GOVERNMENT ACCOUNTABILITY OFFICE, REPORT TO CONGRESSIONAL REQUESTERS, BORDER PATROL: CHECKPOINTS CONTRIBUTE TO BORDER PATROL'S MISSION, BUT MORE

35.     Border Patrol does not release stop data or other information related to interior enforcement operations. Although it is clear the Border Patrol's warrantless detention and searches sometimes extend even further than 100 miles into the interior of the country,[10] very little is known about the extent of Border Patrol's application of the 100-mile zone.

36.     What little is publicly known has been revealed primarily through FOIA requests and litigation.

37.     For example, an examination of the Border Patrol arrest records obtained through litigation for the Sandusky Bay station in Ohio, conducted by Dr. Kara Joyner, a Professor of Sociology at Bowling Green State University, found that Latinos made up 85% of Border Patrol arrests in 2009, 67% of arrests in 2010, and 62% of arrests in 2011.[11] In contrast, Latinos make up only three percent of the

---

CONSISTENT DATA COLLECTION AND PERFORMANCE MEASUREMENT COULD IMPROVE EFFECTIVENESS, GAO-09-824 at *28, (Aug. 2009), *available at* http://www.gao.gov/products/GAO-09-824.

[10] *See, e.g.*, David Antón Armendáriz, *On the Border Patrol and Its Use of Illegal Roving Patrol Stops*, 14 SCHOLAR 553, 556–60 (2012) (describing numerous roving patrol stops occurring more than 100 miles from the border).

[11] *See* Encarnacion Pyle, *Alleging Profiling, OSU Students Help Sue Border Patrol* COLUMBUS DISPATCH, Nov. 19, 2014, *available at* http://www.dispatch.com/content/stories/local/2014/11/18/OSU-students-help-sue-Border-Patrol.html (last visited Nov. 16, 2016).

15

population of the Sandusky Bay region.[12] Although the Sandusky region borders Lake Erie, less than one percent of those stopped by Border Patrol in the Sandusky station were Canadian.[13]

38.     Similarly, in 2012 the ACLU of Washington filed a class action lawsuit on behalf of multiple individuals subjected to racial profiling in Border Patrol roving patrol operations on the Olympic Peninsula in Washington State. Border Patrol settled the case in September 2013, agreeing to re-train agents on their obligations under the Fourth Amendment and to share stop data with the ACLU.[14]

39.     In January 2013, following extensive FOIA litigation, Families for Freedom issued a report disclosing a Border Patrol "incentives program" and documenting the Border Patrol's arrests of hundreds of immigrants with legal status in interior enforcement operations.[15] A prior report, *Justice Derailed*, issued

---

[12] *Id.*

[13] *Id*.

[14] *See* "Settlement Reigns in Border Patrol Stops on the Olympic Peninsula," (Sept. 24, 2013), *available at*  https://www.aclu.org/news/settlement-reins-border-patrol-stops-olympic-peninsula (last visited Nov. 16, 2016).

[15] *See* FAMILIES FOR FREEDOM, UNCOVERING USBP: INCENTIVES PROGRAMS FOR UNITED STATES BORDER PATROL AGENTS AND THE ARREST OF LAWFULLY PRESENT INDIVIDUALS (Jan. 2013), *available at* http://bit.ly/1bjjh8h.  CBP denied the existence of documents responsive to

by the New York Civil Liberties Union ("NYCLU") and based on the same FOIA request, disclosed data related to thousands of Border Patrol stops aboard public transportation in upstate New York.[16] The vast majority of those stops occurred far from the border, with only one percent resulting in initiation of removal proceedings; many involved violations of agency guidelines, including improper reliance on race, or resulted in the arrest of lawfully-present individuals.

40.    Federal jurists have for decades expressed concern that Border Patrol's interior operations result in widespread rights violations, and have questioned the expansion of Border Patrol's interior enforcement operations.[17]

---

plaintiffs' FOIA request for more than a year before finally producing them. The report notes, "Contrary to sworn statements submitted in the federal district court stating that the agency did not maintain an array of arrest statistics, including annual totals for the Rochester Station, the depositions ordered by the Court revealed that arrest statistics are the primary measure employed by local USBP stations and their Sector supervisors in the Buffalo Sector."

[16] *See* NYCLU, JUSTICE DERAILED (Nov. 2011), *available at* http://bit.ly/N7A03q.

[17] *See, e.g.*, *United States. v. Soto-Zuniga*, 837 F.3d 992, 998-99 (9th Cir. 2016) (holding that because there are serious questions about the constitutionality of Border Patrol checkpoints, the district court abused its discretion in denying discovery regarding the number and types of arrests and vehicle searches at a checkpoint because that information was relevant to determining the constitutionality of the checkpoint where the defendant was arrested); *United States v. Garcia*, 732 F.2d 1221, 1229 (5th Cir. 1984) (Tate, J., dissenting) ("Quite unfortunately, we have the opportunity only to review the successful guesses of these agents; we are never presented with the unconstitutionally intrusive stops of Hispanic residents and citizens that do not result in an arrest. Differentiating the

41.     Information about Border Patrol's interior enforcement practices is critical to an informed debate within both the legal community and broader public about whether Border Patrol's authority to conduct warrantless searches and stops can or should extend far into the interior of the country, both as a matter of constitutional law and as a matter of public policy.[18]

---

United States from police states of past history and the present, our Constitution in its Fourth Amendment prohibition against unreasonable searches protects all our residents, whether middle-class and well-dressed or poor and disheveled, from arbitrary stop by governmental enforcement agents in our travel upon the highways of this nation."). By contrast, several courts have allowed Border Patrol operations even beyond the 100 mile limit. *See, e.g.*, *United States v. Pacheco-Espinosa,* 354 F. Supp. 2d 1219, 1223-24 (D.N.M. 2003) ("Current regulations interpret 'reasonable distance' as 100 air miles from the border. The Tenth Circuit has nevertheless held that the regulation does not foreclose searches beyond that limit...this Court determines that the approximately 120-mile distance in which Defendant was stopped was a reasonable distance from the border.") (citations omitted); *United States v. Orozco*, 191 F.3d 578, 584 (5th Cir. 1999) (Dennis, J., dissenting) ("As I read *Brignoni-Ponce*, the Supreme Court's authorization of roving Border Patrol stops on the basis of reasonable suspicion is limited to such stops within the 100 mile border zone created by 8 U.S.C. § 1357(a)(3) and 8 C.F.R. § 287.1. It would be unreasonable to assume that the Supreme Court meant to dilute the protections of the Fourth Amendment so as to authorize the Border Patrol to make suspicion-based roving patrol stops anywhere in the United States. The Court's opinion indicates no such intention.").

[18] *E.g.*, *Moving the Line of Scrimmage: Re-Examining the Defense-In-Depth Strategy: Hearing Before H. Subcomm. On Border and Maritime Sec.*, 114th Cong. (2016).

18

42.     As set out in the introduction, the limited information released by Defendants to date in response to Plaintiffs' FOIA request only raises more questions.

43.     Without the release of all of the documents Plaintiffs have requested, the public will remain unaware of the impact of the Border Patrol enforcement operations being conducted in Michigan, and of the extent to which the Border Patrol is conducting warrantless detentions and searches throughout the entire state.

## PLAINTIFFS' FOIA REQUEST

44.     On May 21, 2015, Plaintiffs submitted their FOIA request by email to Defendant CBP's FOIA Officer/Public Liaison Sabrina Burroughs at cbpfoia@dhs.gov. Attached as Exhibit B is a true and correct copy of the email submitting the FOIA request.

45.     On information and belief, Defendant received the FOIA request on May 21, 2015.

46.     Also on May 21, 2015, Plaintiffs mailed a hard copy of the Request to CBP's FOIA Officer/Public Liaison via certified U.S. mail.

47.     Plaintiffs requested expedited processing of the FOIA request on the grounds that there is a "compelling need" for release of the requested records, because the information therein is urgently needed by organizations primarily

engaged in disseminating information to inform the public about Border Patrol activities. *See* 5 U.S.C. § 552(a)(6)(E); 6 C.F.R. § 5.5.(d)(1)(ii).

48.     Plaintiffs requested a full waiver of all fees, explaining that disclosure of the requested records "is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of government," and further asserting that disclosure is "not primarily in the commercial interest of the requester." *See* 5 U.S.C. § 552(a)(4)(A)(iii); *see also* 6 C.F.R. § 5.11(k)(1).

49.     Plaintiffs also sought a waiver of all processing (search and review) fees because the ACLU and MIRC qualify as "representatives of the news media" and Dr. Boyce and Dr. Oglesby qualify as representatives of the news media. 5 U.S.C. § 552(a)(4)(A)(ii)(II); 6 C.F.R. § 5.11(d)(1), (k).

50.     On July 13, 2015, after receiving no response to the FOIA request, Plaintiffs submitted the FOIA request again through the FOIA Online System. Attached as Exhibits C and D are the true and correct copies of, respectively, the FOIA Online System submission and the FOIA Online System receipt.[19]

---

[19] The resubmitted FOIA request was assigned tracking number CBP-2015-042176. There are several different FOIA tracking numbers related to this case, including CBP-2015-036215 (upon information and belief the tracking number assigned to the FOIA submitted on May 21, 2015) and CBP-OBP-2015-036215 (upon information a belief the tracking numbers assigned when the FOIA was reassigned from CBP to the Office of Border Patrol).  *See* 10/21/2015, Email from CBPFOIA@cbp.dhs.gov to Miriam Aukerman (Exhibit M) (stating CBP-2015-

## PROCESSING OF PLAINTIFFS' FOIA REQUEST

51.    On October 6, 2015, ACLU attorney Miriam Aukerman received an email from CBPFOIA@cbp.dhs.gov stating that the request for expedited processing had been denied.   The only reason given was: "Does not meet requirements per DHS regulations." Attached as Exhibit E is a true and correct copy of that email.

52.    On October 14, 2015, Ms. Aukerman appealed the rejection of the request for expedited processing.   Attached as Exhibit F is a copy of that appeal letter (minus the signature).

53.    On October 21, 2015, Ms. Aukerman received an email from CBPFOIA@cbp.dhs.gov stating that: "Your request for Fee Waiver for the FOIA request CBP-2015-042176 has been determined to be not applicable as the request is not billable."   Attached as Exhibit G is a true and correct copy of that email.

54.    On November 19, 2015, Plaintiffs appealed Defendants' failure to make a timely determination of the FOIA request and reiterated the appeal of the denial of expedited processing. Attached as Exhibit H is a true and correct copy of

---

042176 is a duplicate to 2015-036215); 10/30/2015 Email from CBPFOIA@cbp.dhs.gov to Miriam Aukerman (Exhibit N) (stating CBP-2015-036215 had its tracking number changed to CBP-OBP-2015-036215); 10/26/2016 Aukerman Email (seeking clarification on case numbers and noting that on-line system was not allowing access to CBP-2015-036215) (Exhibit O).

that appeal, which was submitted by certified mail and via the FOIA on-line system.

55.     On January 12, 2016 the CBP FOIA Division submitted an initial response to Plaintiffs' FOIA request. See Exhibit I, CBP's initial response to Plaintiffs' FOIA request.

56.     In response to Section A of Plaintiffs' FOIA request (daily apprehension logs), Defendants produced 4,624 pages of documents, all but two pages of which were partially redacted, allegedly pursuant to the FOIA exemptions found at 5 U.S.C. § 552(b)(6), (b)(7)(C) and (b)(7)(E).

57.     CBP produced no documents in response to Section B (documents showing individual stops and detentions), Section C (policy and procedure documents related to interior enforcement), or Section D (complaint documents) of the FOIA request. CBP indicated that it would be working on producing documents in response to sections C and D.  With respect to Section B, CBP proposed producing only one in ten of the requested documents.

58.     CBP did not provide any additional information related to Plaintiffs' request for a fee waiver or Plaintiffs' appeal of the denial of expedited processing.

59.     By letter sent by e-mail and certified postal mail to DHS's Associate General Counsel and DHS's FOIA Officer dated February 29, 2016, Plaintiffs appealed CBP's withholding of information from Section A and failure to produce

any documents responsive to Section B, C or D of the FOIA request. Plaintiffs explained that the ten percent production approach for Section B is inadequate, but offered to negotiate a production schedule. That administrative appeal is attached to this Complaint as Exhibit J and is incorporated by reference.[20]

60.     On information and belief, CBP received Plaintiffs' letter of appeal on March 9, 2016.

61.     On May 9, 2016, Shari Suzuki, Chief of FOIA Appeals, Policy, and Litigation Branch, administratively closed Plaintiffs' appeal "because CBP's FOIA Division and the Border Patrol are still actively processing their response to the initial FOIA request." That administrative closure is attached to this Complaint as Exhibit K and is incorporated by reference.

62.     On September 30, 2016, Ms. Suzuki wrote Ms. Aukerman in response to the appeals of the denial of expedited processing that the Plaintiffs had submitted almost a year earlier, on October 14, 2015 and November 19, 2015. The appeal on expedited processing was denied. In addition, the letter stated that

---

[20] Plaintiffs also notified CBP's FOIA division, through a letter sent by certified mail, the FOIA on-line system, and electronic mail, that Plaintiffs would no longer accept service of correspondence or notification of production of documents through the FOIA online system because, despite Plaintiffs' repeated efforts to bring problems with the online system to the attention of CBP's FOIA Division, those problems were not rectified. *See* 2/26/2016 Aukerman Letter (Exhibit P).

problems with the FOIA Online system could not be remedied in order to allow Plaintiffs to track the progress of the FOIA online. Finally, the letter stated that the appeal of the constructive denial of the FOIA request was moot because the agency had released some documents on January 12, 2016. That letter is attached to this Complaint as Exhibit L.

63.     To date, Plaintiffs have not received any documents (other than the redacted apprehension logs) that are responsive to their request.

64.     Defendants have wrongfully withheld requested records from Plaintiffs.

65.     On information and belief, Defendants have failed to make reasonable efforts to search for responsive records.

66.     Plaintiffs have exhausted the applicable administrative remedies. 5 U.S.C. § 552(a)(6)(C)(i).

## CAUSES OF ACTION

### VIOLATIONS OF THE FREEDOM OF INFORMATION ACT

67.     Plaintiffs repeat, re-allege, and incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

68.     Defendants have failed to make a reasonable effort to search for records sought by the Request, and that failure violates FOIA, 5 U.S.C. § 552(a)(3), and Defendants' corresponding regulations, *see* 6 C.F.R. § 5.4.

69.     Defendants have failed to promptly make available the records sought by the Request, and that failure violates FOIA, 5 U.S.C. § 552(a)(6)(A), and Defendant's corresponding regulations *see* 6 C.F.R. § 5.6.

70.     Defendants have violated 5 U.S.C. §552(a)(3) by withholding and redacting disclosable records in its possession that are not exempt from disclosure under 5 U.S.C. §§ 552(b)(6), 552(b)(7)(C), 552(b)(7)(E).

71.     Defendants have violated 5 U.S.C. §552(a)(3) by removing information from documents relating to Entry Landmark, Arrest Landmark, Apprehending Officer's Assigned Station, and Event Number, citing 5 U.S.C. § 552(b)(7)(E). The requested information is not exempt under 5 U.S.C. § 552(b)(7)(E).

72.     Defendants have violated 5 U.S.C. §552(a)(3) by removing information from documents relating to Apprehending Officer Names, citing 5 U.S.C. §§ 552(b)(6), (b)(7)(C). The requested information is not exempt under 5 U.S.C. §§ 552(b)(6), (b)(7)(C).

73.     Defendants have failed to grant Plaintiffs' request for a waiver of search, review, and duplication fees, and that failure also violates FOIA, 5 U.S.C. § 552(a)(4), and corresponding regulations, *see* 6 C.F.R. §§ 5.6(c), 5.11(k).

74.    Defendants have failed to grant Plaintiff's request for a limitation of fees, and that failure violates FOIA, 5 U.S.C. § 552(a)(4), and corresponding regulations, *see* 6 C.F.R. §§ 5.6(c), 5.11(d).

## REQUESTED RELIEF

WHEREFORE, Plaintiffs pray that this court:

75.    Declare that Defendants' failure to timely respond to Plaintiffs' FOIA Request; to conduct a reasonable search; to waive or limit search, review and duplication fees; and to fully disclose all requested records without redactions is unlawful;

76.    Issue an injunction ordering Defendants to immediately disclose the requested records and to make copies available to Plaintiffs at no charge;

77.    Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action, pursuant to 5 U.S.C. § 552(a)(4)(E); and

78.    Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Samuel C. Damren            /s/ Miriam Aukerman
Samuel C. Damren (P25522)       Miriam Aukerman (P63165)
Corey Q. Wheaton (P80202)       American Civil Liberties Union
Dykema Gossett PLLP             Fund of Michigan
400 Renaissance Center          1514 Wealthy Street, Suite 201
Detroit, MI 48243               Grand Rapids, MI 49506
(313) 568-6519                  (616) 301-0930
sdamren@dykema.com              maukerman@aclumich.org
cwheaton@dykema.com

26

Attorneys for Plaintiffs
Michigan Immigrant Rights
Center, Geoffrey Alan Boyce,
and Elizabeth Oglesby

Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
American Civil Liberties Union
Fund of Michigan
2966 Woodward Avenue
Detroit, MI  48201
(313) 578-6814
msteinberg@aclumich.org
kmoss@aclumich.org

Attorneys for Plaintiffs Michigan
Immigrant Rights Center, Geoffrey
Alan Boyce, Elizabeth Oglesby, and
American Civil Liberties Union of
Michigan

Dated:  November 30, 2016