EXHIBIT A

Plaintiffs' FOIA Request
(May 21, 2015)



2966 Woodward Avenue
Detroit, MI 48201
Phone 313.578.6800
Fax 313.578.6811
Email aclu@aclumich.org
www.aclumich.org

115 West Allegan Street
Lansing, MI 48933
Phone 517.372.8503
Fax 517.372.5121
Email aclu@aclumich.org
www.aclumich.org

1514 Wealthy SE, Suite 242
Grand Rapids, MI 49506
Phone 616.301.0930
Fax 616.301.0640
Email aclu@aclumich.org
www.aclumich.org

May 21, 2015

*VIA ELECTRONIC AND CERTIFIED U.S. MAIL:*

FOIA Officer/Public Liaison: Sabrina Burroughs
U.S Customs and Border Protection
90 K Street NE, 9th Floor
Washington, D.C. 20229-1181
cbpfoia@dhs.gov

### Re: *Freedom of Information Act Request/Expedited Processing Requested*

Dear Ms. Burroughs:

This is a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 522, and related Department of Homeland Security ("DHS") implementing regulations, *see* 6 C.F.R. § 5 (Department of Homeland Security, Disclosure of Records and Information). The Request is submitted by the American Civil Liberties Union of Michigan, the American Civil Liberties Union Fund of Michigan (hereinafter jointly "ACLU")[1], the Michigan Immigrant Rights Center ("MIRC"), Geoffrey Alan Boyce, of the University of Arizona School of Geography and Development, and Elizabeth Oglesby, of the University of Arizona Center for Latin American Studies (collectively "Requesters").

Requesters seek disclosure of documents related to the enforcement activities of the U.S. Border Patrol and/or its officers and/or staff for Fiscal Years 2012 through 2014. Documents are requested for the Detroit Sector. As noted below, for comparison purposes, some documents are also requested for the Buffalo and Tucson Sectors.

---

[1]  The American Civil Liberties Union is a nationwide, non-profit, non-partisan organization dedicated to protecting civil liberties and human rights in the United States. It is the largest civil liberties organization in the country, with offices in 50 states, and over 500,000 members. The American Civil Liberties Union Fund of Michigan and the American Civil Liberties Union of Michigan are the state affiliate organizations. The two organizations are separate, but integrated. The ACLU Fund of Michigan is a 26 U.S.C. § 501(c)(3) organization that provides legal representation free of charge to individuals and organizations in civil rights and civil liberties cases and educates the public about civil rights and civil liberties issues. The ACLU of Michigan is a 26 U.S.C. § 501(c)(4) organization that provides analyses of pending and proposed legislation, engages in legislative advocacy, and mobilizes the American Civil Liberties Union's members to lobby their legislators. For the purposes of this request, the term "ACLU" is used to mean the ACLU Fund of Michigan and the ACLU of Michigan.



**BACKGROUND**

Since 2006, the U.S. Border Patrol ("USBP") has nearly doubled in size, from approximately 12,000 agents to over 21,000 today. The budget for U.S. Customs and Border Protection ("CBP") has more than doubled from $6 billion in Fiscal Year 2006 to $12.7 billion in FY 2015.[2] In the Border Patrol's Detroit Sector, specifically, the agency has grown from 80 agents in FY 2003 to 406 agents in FY 2014 – a 507% increase, the fastest rate of growth of any sector in the United States during this same period.[3] U.S. taxpayers now spend over $18 billion on immigration enforcement agencies – more than on all other federal law enforcement combined.[4] One result of these unprecedented expansions is an increase in reported Border Patrol abuses in the Great Lakes region,[5] and nationally.[6] The U.S. Border Patrol claims authority to conduct warrantless stops and seizures within a "reasonable distance" of the border.[7] That distance is defined by outdated regulations to be "100 air miles"[8] from any external boundary, including coastal boundaries, and thus encompasses roughly two-thirds of the U.S. population and the entirety of several states.[9] A map obtained by the ACLU of Michigan from Border Patrol

---

[2] *See* DEP'T OF HOMELAND SEC., FY 2015 BUDGET IN BRIEF, 7 (2014), *available at* http://www.dhs.gov/sites/default/files/publications/FY15BIB.pdf (last visited May 12, 2015).

[3] *See* UNITED STATES BORDER PATROL BORDER PATROL AGENT STAFFING BY FISCAL YEAR (2014), available at: www.cbp.gov/sites/default/files/documents/BP%20Staffing%20FY1992-FY2014_0.pdf (last visited May 12, 2015).

[4] *See* Meissner, Doris, *et al*., IMMIGRATION ENFORCEMENT IN THE UNITED STATES: THE RISE OF A FORMIDABLEMACHINERY, MIGRATION POLICY INSTITUTE, 9 (Jan. 2013), *available at* http://www.migrationpolicy.org/pubs/enforcementpillars.pdf (last visited May 12, 2015).

[5] *See Muniz-Muniz v. U.S. Border Patrol*, 3:09 CV 1865, 2012 WL 5197250 (N.D. Ohio Oct. 19, 2012); NYCLU, JUSTICE DERAILED, (Nov. 2011), *available at* http://www.nyclu.org/ files/publications/NYCLU_justicederailedweb_0.pdf; FAMILIES FOR FREEDOM, UNCOVERING USBP: INCENTIVES PROGRAMS FOR UNITED STATES BORDER PATROL AGENTS AND THE ARREST OF LAWFULLY PRESENT INDIVIDUALS, (Jan. 2013), *available at* http://familiesforfreedom.org/sites/default/files/resources/Uncovering%20USBP-FFF%20Report%202013.pdf.

[6] From 2004-2011, as the ranks of agents doubled to more than 21,000, complaints involving CBP received by the DHS Office of Civil Liberties and Civil Rights nearly tripled. *See* DEP'T OF HOMELAND SEC., OFFICE OF CIVIL RIGHTS AND CIVIL LIBERTIES, "DEPARTMENT-WIDE DATA ON COMPLAINTS RECEIVED," *available at* www.dhs.gov/department-wide-data-complaints-received (last visited May 12, 2015). Given the many problems with the DHS complaint system, it is likely that incidents of abuse are substantially under-reported.

[7] 8 U.S.C. § 1357(a)(3).

[8] 8 C.F.R. § 287.1(b). The Justice Department published regulations defining "reasonable distance" as 100 miles in the Federal Register in 1957. *See* Field Officers: Powers and Duties, 22 FED. REG. 236, 9808–09 (Dec. 6, 1957) (to be codified at C.F.R. § 287). There is no other public history as to why the Justice Department chose 100 miles as the "reasonable distance" from the border.

[9] Though immigration checkpoints are mostly confined to the southwest, Border Patrol has operated temporary checkpoints in northern states as well. A recent Freedom of Information

purports to show that the entire state of Michigan is within the 100 mile zone. *See* Exhibit A (Border Patrol map).

Litigation involving Border Patrol's Detroit Sector highlights the importance of public access to documents concerning Border Patrol activities. *Muniz-Muniz v. U.S. Border Patrol*, which is pending in the Northern District of Ohio, alleges unconstitutional racial profiling by agents assigned to the Border Patrol's Sandusky station, part of the Detroit Sector responsible for boundary enforcement activities in northeast Ohio.[10] Specifically, the lawsuit alleges significant over-representation of Hispanic and Mexican individuals in USBP apprehension records, when compared to: a) the general population, b) the immigrant population, and c) the estimated undocumented population in the area patrolled by the Sandusky Station. For example, examining USBP arrest records for the Sandusky Station, Dr. Kara Joyner, a sociology professor at Bowling Green State University hired by the plaintiffs in *Muniz-Muniz*, found that Latinos made up 85 percent of those arrested in 2009, 67 percent of arrests in 2010 and 62 percent of arrests in 2011 – even though Latinos comprise only 3 percent of the overall population of the Sandusky Bay region.[11] The extent to which these kinds of abuses may be endemic to other stations in the Detroit Sector, or to the Sector as a whole, is both unknown and of important public consequence.

Litigation and investigative reports around the country have exposed similar problems elsewhere. For example, in October 2013, the ACLU of Arizona filed a complaint on behalf of five Arizona residents, each of whom was stopped and detained by Border Patrol far from the border.[12] In February 2015 the ACLU of San Diego filed a Freedom of Information Act lawsuit requesting records related to USBP San Diego Sector roving patrol activities, and alleging that many of these activities are unlawful.[13] In September 2013, the ACLU of Washington settled a class action lawsuit challenging roving patrol practices on the Olympic Peninsula on behalf of several victims of racial profiling.[14] Pursuant to that settlement, Border Patrol agreed to re-train

---

Act (FOIA) request uncovered design plans for permanent checkpoints on southbound New England highways. *See* ACLU of Vermont, *Surveillance on the Northern Border,* 2013, *available at* http://www.acluvt.org/surveillance/northern_border_report.pdf (last visited May 12, 2015).

[10] *Muniz-Muniz v. U.S. Border Patrol*, 3:09 CV 1865, 2012 WL 5197250 (N.D. Ohio Oct. 19, 2012).

[11] *See* Encarnacion Pyle, *Alleging Profiling, OSU Students Help Sue Border Patrol* COLUMBUS DISPATCH, Nov. 19, 2014, *available at* www.dispatch.com/ content/stories/local/2014/11/18/OSU-students-help-sue-Border-Patrol.html (last visited May 20, 2015).

[12] Complaint *available at* www.acluaz.org/sites/default/files/documents/ACLU%20AZ%20Complaint% 20re%20CBP%20Roving%20Patrols%20Oct%209%202013.pdf (last visited May 12, 2015).

[13] *American Civil Liberties Union of San Diego and Imperial Counties v. United States Department of Homeland Security,* 8:15 CV 00229−JLS−RNB (United States District Court For The Central District Of California, Southern Division − Santa Ana, February 10, 2015).

[14] See *Sanchez v. U.S. Office of Border Patrol*, No. 2:12-cv-00735 (W.D. Wa. *filed* Apr. 26, 2012); Complaint *available at* https://aclu-wa.org/cases/sanchez-v-homeland-security-0 (last visited May 12, 2015).; *see also* Manuel Valdes, *ACLU, Immigrant Groups to Keep an Eye on*

agents on their obligations under the Fourth Amendment and to share stop data with the ACLU.[15] In January 2013, following extensive FOIA litigation, Families for Freedom and New York University (NYU) issued a report disclosing a "bonus program" for Border Patrol agents and the widespread practice of arresting lawfully present individuals. (CBP denied the existence of documents responsive to plaintiffs' FOIA request for more than a year before finally producing them).[16] The report notes:

> The documents show that USBP agents act on the assumption that no matter where they operate within the United States, they may arrest any noncitizen— whether a tourist or a long☐term legal resident with a driver's license—whenever that person is not carrying detailed documentation that provides proof of status. But USBP's records also show that the agents are not genuinely interested in what documents the law might require noncitizens to carry. Instead, USBP's demand for "papers" is universal, resulting in an enforcement culture that maximizes arrest rates.[17]

A prior report, *Justice Derailed,* issued by the New York Civil Liberties Union and based on the same FOIA request, examined thousands of Border Patrol stops aboard public transportation in upstate New York.[18] The vast majority of those stops did not target recent border-crossers and occurred far from the border, with only 1% resulting in initiation of removal proceedings; many involved clear violations of agency arrest guidelines, including improper reliance on race as a basis for questioning passengers and arrests of lawfully present individuals.

Border Patrol abuses are exacerbated by inadequate training, oversight, and accountability mechanisms, as well as a persistent lack of transparency within the Department of Homeland Security (DHS). Border Patrol lowered its training and admissions standards to take

---

*U.S. Border Patrol After Profiling-case Win*, WASH. POST, Sept. 24, 2013, *available at* www.washingtonpost.com/politics/ aclu-immigrant-groups-to-keep-an-eye-on-us-border-patrol-after-profilingcase-win/2013/09/24/d400ae3a-2583-11e3-b75d-5b7f66349852_story.html (last visited May 12, 2015).

[15] *See Settlement Agreement, Sanchez v. U.S. Border Patrol* No. 2:12-cv-00735 (W.D. Wa. 2012), *available at* http://aclu-wa.org/sites/default/files/attachments/2013-09-23--Fully%20Executed%20Settlement%20Agreement.pdf (last visited May 12, 2015).

[16] *See* FAMILIES FOR FREEDOM, UNCOVERING USBP:  BONUS PROGRAMS FOR UNITED STATES BORDER PATROL AGENTS AND THE ARREST OF LAWFULLY PRESENT INDIVIDUALS, (Jan. 2013), *available at* familiesforfreedom.org/sites/default/files/resources/Uncovering%20USBP-FFF%20Report%202013.pdf (last visited May 12, 2015). The report also noted, "Contrary to sworn statements submitted in the federal district court stating that the agency did not maintain an array of arrest statistics, including annual totals for the Rochester Station, the depositions ordered by the Court revealed that arrest statistics are the primary measure employed by local USBP stations and their Sector supervisors in the Buffalo Sector."

[17] *Id.* at v.

[18] *See* NYCLU, JUSTICE DERAILED, (Nov. 2011), *available at* www.nyclu.org/ files/publications/NYCLU_justicederailedweb_0.pdf (last visited May 12, 2015).

on a large number of new agents,[19] and yet the agency has largely failed to adopt reforms such as those related to agents' use of force, contrary to the express recommendations of national law enforcement experts.[20] Meanwhile, oversight bodies like the DHS Office of Inspector General (OIG) and Office for Civil Rights and Civil Liberties (CRCL) – lacking in both enforcement authority and internal transparency – have not kept pace with Border Patrol's rapid growth.[21] As a result, though reports of Border Patrol abuse are increasingly common, many questions remain regarding the full extent and impact of wide-ranging Border Patrol operations.

## PURPOSE

The purpose of this request is to provide the public with information regarding Border Patrol's practices and procedures relating to apprehension, arrest and/or seizure, detention and/or custody, racial profiling, and collaborations with state and local law enforcement. Border enforcement questions go to the heart of the Constitution—and are central to our nation's debates on immigration enforcement and reform—and thus are matters of great public concern. The public has a right to review such practices and procedures in order to ensure that constitutional safeguards are respected and the rights of the most vulnerable are upheld.[22] Your prompt compliance in providing the records herein requested is necessary to vindicate the public's right

---

[19] *See* Rob O'Dell and Bob Ortega, *More Border Agents Assisting Local Police*, ARIZONA REPUBLIC, Dec. 17, 2013, *available at* www.azcentral.com/news/arizona/ articles/20131216border-agents-assisting-local-police.html ("During its hiring surge, the Border Patrol scaled back training and relaxed requirements — such as not requiring a high-school diploma. It sometimes skipped background checks, leading to problems with corruption and poorly trained agents.") (last visited May 12, 2015).

[20] *See* Brian Bennett, *Border Patrol Sees Little Reform on Agents' Use of Force*, Los Angeles Times, February 23, 2015, *available at* www.latimes.com/nation/la-na-border-abuse-20150223-story.html#page=1 (last visited May 12, 2015).

[21] While CBP's budget increased by 97 percent from FY 2004 to FY 2012, OIG's budget increased by only 70 percent during this same time period, while CRCL's budget increased only 56 percent. Overall, the combined budget of the OIG and CRCL accounted for less than .005 percent of the total DHS budget in FY 2011. *See* DEP'T OF HOMELAND SEC., OFFICE OF THE INSPECTOR GENERAL, FISCAL YEAR 2004 ANNUAL PERFORMANCE PLAN 6 (2004), *available at* www.oig.dhs.gov/assets/OIG_APP_FY04.pdf (Last visited May 12, 2015); DEP'T OF HOMELAND SEC., FY 2014 BUDGET IN BRIEF, 6 (2013), *available at* www.dhs.gov/sites/default/files/publications/MGMT/FY%202014%20BIB%20-%20FINAL%20-508%20Formatted%20%284%29.pdf (last visited May 12, 2015); DEP'T OF HOMELAND SEC., OFFICE OF CIVIL RIGHTS AND CIVIL LIBERTIES, FISCAL YEAR 2011 AND ANNUAL REPORT TO CONGRESS, 6 (June 2012), *available at* www.dhs.gov/xlibrary/assets/crcl-annual-report-fy-2011-final.pdf (last visited May 12, 2015).

[22] The public's right to these records is clear. In another recent case, a federal district court repeatedly ordered a local New York CBP office to search for and produce similar documents regarding the office's procedures and practices. *Families for Freedom v. U.S. Customs & Border Prot.,* 797 F. Supp. 2d 375, 382 (S.D.N.Y. 2011); *Families for Freedom v. U.S. Customs & Border Prot.,* 10 Civ. 2705 SAS, 2011 WL 4599592 (S.D.N.Y. Sept. 30, 2011); *Families for Freedom v. U.S. Customs & Border Prot.*, 837 F. Supp. 2d 287 (S.D.N.Y. 2011); *Families for Freedom v. U.S. Customs & Border Prot.*, 837 F.Supp.2d 331 (S.D.N.Y. 2011).

to be part of an "informed citizenry, vital to the functioning of a democratic society, needed to check against corruption, and to hold the governors accountable to the governed."[23]

**RECORDS REQUESTED**

As used herein, the term "records" should be understood broadly, and includes all records or communications preserved in electronic or written form, including but not limited to: correspondence, emails, documents, data, statistics, videotapes, audio tapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, policies, procedures, memoranda, agreements, instructions, training materials, notes (including handwritten), orders, legal opinions, protocols, reports, manuals, technical specifications, studies, or any other record of any kind.

Should any responsive record contain the personal identifying information of any individual stopped or detained by the U.S. Border Patrol, or any other DHS entity, Requesters ask that the agencies redact that information. This Request seeks aggregate stop data and records relevant to USBP operations, *not* any personal or identifying information about any specific individual(s), such as individual names or A-numbers.

**Unless otherwise noted, all requests are for the Fiscal Years 2012 through 2014. In addition, all requests are for records for the Detroit Sector, except that, where noted under section A.1., records from the Buffalo and Tucson sectors are also requested.**

Specifically, Requesters seek:

A.  **Documents Related to Daily Apprehension Logs:**

1.  **Daily Apprehension Logs for the Detroit, Buffalo and Tucson Sectors.** This includes, but is not limited to all data and statistics relating to:

     a.  Sex

     b.  Adult/Juvenile Age

     c.  Status at Entry

     d.  Entry Landmark

     e.  Arrest Landmark

     f.  Arrest Method (e.g., Other Agency, Patrol Border)

     g.  Deportable

     h.  Status When Found

     i.  Time in U.S.

---

[23] *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1979).

    j.  Port of Entry

    k.  Disposition

    l.  Nationality/ Country of Citizenship;

    m.  Remarks – Principal/Smuggled

    n.  Apprehending Officer Name(s)

    o.  Apprehending Officer's Assigned Station

    p.  Complexion

    q.  Criminal Record

    r.  Event Number

**B. Documents Showing Individual Stops and Detentions**

1. Copies of all Form I-213s ("Record of Deportable/Inadmissible Alien") for the Detroit Sector:

   a. For each individual detained or taken into custody; and

   b. For each individual transferred to USBP by state or local law enforcement officials.

2. Copies of all Form I-44s ("Report of Apprehension or Seizure") for the Detroit Sector:

   a. For each individual transferred to USBP by state or local law enforcement officials; and

   b. For each individual stopped but not arrested by USBP for whom I-44's were issued.

3. For the Detroit Sector, all records that provide possible codes and/or words and/or phrases (hereinafter "code(s)"), along with explanations of those codes, that could be filled in by USBP on the Daily Apprehension Logs, I-213 forms and I-44 forms, including any records related to the meaning of codes:

   a. Under "Method of Location/Apprehension";

   b. Under "Status when Found";

   c. Under "Criminal Record"; and

    d.  Under "Cmplxn," and any records that instruct, guide, or train officers about how to determine how to classify arrestees by their complexion.

## C.  Documents Related to Interior Enforcement

1. For the Detroit Sector, all records setting forth policies and procedures related to the planning and/or implementation of USBP interior enforcement actions, including raids, patrols, and other contact with members of the public for the purpose of enforcing immigration law.  This includes:

    a.  Any and all policies, procedures, guidelines, memoranda, instructions, protocols and training materials regarding the circumstances under which CBP agents may participate in task forces with local law enforcement or provide operational backup to state or local law enforcement, or under which CBP agents may enforce state law.

    b.  Any and all policies, procedures, guidelines, memoranda, instructions, protocols and training materials regarding USBP agents' use of race or ethnicity as a factor in law enforcement decisions.

    c.  All records describing, defining or delimiting USBP's patrol areas, including but not limited to maps of patrols or patrol areas and maps of apprehensions.

    d.  All records containing guidance, including but not limited to that from other federal agencies or components of the Department of Homeland Security, regarding enforcement activities related to specific nationalities, ethnicities, faith communities or groups. This includes any guidance regarding what conditions or activities constitute suspicious activity authorizing or requiring scrutiny or contact by USBP personnel.

    e.  All records regarding when and under what circumstances it is appropriate for USBP to engage in particular methods of law enforcement, including but not limited to pedestrian stops, vehicle stops, stops based on reasonable suspicion or consent, searches authorized by court-issued warrants or based on consent.

2. All records, including emails, relating to policies and procedures for collaboration between USBP and state or local law enforcement agencies in the Detroit Sector on the following issues:

    a.  Operational backup or support provided by USBP personnel to state or local law enforcement agencies;

    b.  Multi-jurisdictional task force activities that include USBP personnel;

    c.  The investigation of the immigration status of crime victims or witnesses;

      d.  Racial or ethnic profiling and/or racial or ethnic profiling concerns.

3. For the Detroit Sector, all records that contain any information regarding arrest quotas, targets, goals and expectations that USBP or its personnel were required to meet from fiscal year 2008 to the present.

4. Performance review standards for USBP and its personnel from fiscal year 2008 to the present.

**D.  Documents Related to Complaints**

1. Any records within the possession of the CBP concerning complaints received and/or investigated by DHS, any DHS subcomponents, including CBP internal affairs, the Office for Civil Rights and Civil Liberties (CRCL), Office of Inspector General (OIG); Office of Professional Responsibility (OPR) and internal affairs against CBP or its agents or employees in the Detroit Sector, including but not limited to:

      a.  Complaints alleging misconduct with respect to apprehension, arrest and/or seizure, detention and/or custody, racial profiling, and collaborations with state and local law enforcement;

      b.  Complaints received through any complaint line or email box or through referral from CBP, CRCL, OIG, OPR or any other agency within DHS;

      c.  All disciplinary actions taken in response to any such complaints.

We request that responsive electronic records be provided electronically in their native file format, if possible. 5 U.S.C. § 552(a)(3)(B). Alternatively, we request that the records be provided electronically in a text-searchable, static-image format (PDF), in the best image quality in the agencies' possession, and that the records be provided in separate, Bates-stamped files. We further request that reasonable metadata be transmitted along with responsive documents, including but not limited to email attachments, author and recipient information, date and time stamps, and the like.

**REQUEST FOR EXPEDITED PROCESSING**

Requester seeks Track 1 expedited processing for this FOIA request, pursuant to 5 U.S.C. § 552(a)(6)(E)(i) ("Each agency shall promulgate regulations, pursuant to notice and receipt of public comment, providing for expedited processing of requests for records—(I) in cases in which the person requesting the records demonstrates a compelling need . . . .").

A "compelling need" exists when "a failure to obtain requested records on an expedited basis under this paragraph could reasonably be expected to pose an imminent threat to the life or physical safety of an individual." 5 U.S.C. § 552(a)(6)(E)(v)(I); *see also* 6 C.F.R. § 5.5(d)(1)(i). Without expedited disclosure of the requested records, individuals in USBP custody may face

9

continuing, imminent threats to their life or physical safety. This is particularly true given the volume and persistent nature of the alleged abuses outlined above. There is thus a "compelling need" for the requested records.

A "compelling need" can also be demonstrated "with respect to a request made by a person primarily engaged in disseminating information," by an "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II); 6 C.F.R. § 5.5(d)(1)(ii). Here, the ACLU and MIRC are "person[s] primarily engaged in disseminating information," and there is an urgent need to inform the public regarding Border Patrol activities.

With respect to the ACLU, dissemination of information to the public about actual or alleged government activity is a critical and substantial component of the ACLU's mission and work. The ACLU seeks to defend and preserve the individual rights and liberties that the Constitution and laws of the United States guarantee everyone in this country. The ACLU has a particular commitment to ensuring that fundamental constitutional protections of due process and equal protection are extended to every person, regardless of citizenship or immigration status, and that government respects the civil and human rights of all people. Educating the public is a central to this work. Specifically, the ACLU publishes a blog, newsletters, reports, fact sheets, news briefings, "Know Your Rights" documents, and other educational and informational materials that are designed to educate the public about civil liberties issues and governmental policies that implicate civil rights and liberties. These ACLU publications often include descriptions and analyses of information obtained from the government through FOIA, as well as information about cases, governmental policies, pending legislation, abuses of constitutional rights, and polling data. *Cf. Electronic Privacy Information Center v. Department of Defense*, 241 F. Supp. 2d 5, 13–14 (D.D.C. 2003) (finding the Electronic Privacy Information Center to be a representative of the news media under Department of Defense regulations because it published a "bi-weekly electronic newsletter that is distributed to over 15,000 readers" about "court cases and legal challenges, government policies, legislation, civil rights, surveys and polls, legislation, privacy abuses, international issues, and trends and technological advancements.").

The website of the ACLU of Michigan (www.aclumich.org) addresses civil rights and civil liberties issues in depth, provides information on civil rights and civil liberties issues in the news, and contains a large volume of documents relating to the issues on which the ACLU is focused, including immigration. The websites of the National ACLU and other state ACLU affiliates similarly feature information obtained through the FOIA process.[24] The ACLU further disseminates information to the public via social media platforms such as Facebook and Twitter.

---

[24] *See, e.g.*, THE TORTURE DATABASE, http://www.thetorturedatabase.org (last visited May 12, 2015); MAPPING THE FBI, http://www.aclu.org/mappingthefbi (last visited Mar. 16, 2015); *see also, e.g.*, Press Release, ACLU of San Diego & Imperial Counties, CBP Releases Report, New Training Handbook (May 22, 2014), http://www.aclusandiego.org/radio-silence-border-patrol-use-force-policies-leads-lawsuit/ (last visited  May 12, 2015).

ACLU materials are specifically designed to be educational and are widely disseminated to the public.[25] These materials are widely available to everyone, including individuals, tax-exempt organizations, not-for-profit groups, law students, and faculty, for no cost or for a nominal fee through the ACLU's public education department and websites. *See Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d at 11 (finding the Electronic Privacy Information Center to be a news-media requester because of its publication and distribution of seven books on privacy, technology, and civil liberties).

Similarly, MIRC, which is a legal resource center for Michigan's immigrant communities, is heavily engaged in disseminating information. MIRC disseminates information about topics affecting immigrants and refugees via a variety of media including its website, social media, and an email newsletter service. The MIRC website (michiganimmigrant.org) provides extensive information on immigration-related issues. The website includes a library of materials used by community advocates. It includes a database of documents previously obtained through FOIA from Immigration and Customs Enforcement.[26] In the past two years, the website has received 78,147 page views from 18,162 unique users seeking information. Last year, MIRC made presentations about immigration law and immigrant rights to more than 3,800 individuals and responded to 483 requests for technical support from attorneys and advocates.

Depending on the results of this Request, the ACLU and MIRC plan to disseminate the information they receive among the public through these kinds of publications in these kinds of channels. The ACLU and MIRC are therefore organizations "primarily engaged in disseminating information" within the meaning of the statute and the relevant regulations. Indeed, the fact that that ACLU meets these criteria has previously been recognized in FOIA litigation between the ACLU and the Department of Justice. *See, e.g.*, *American Civil Liberties Union v. Department of Justice*, 321 F. Supp. 2d 24, 30 n.5 (D.D.C. 2004) (finding that a non-profit, public-interest group that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience" is "primarily engaged in disseminating information" (internal citation omitted)).

Moreover, this Request concerns actual or alleged federal government activity that is a matter of current exigency. As discussed above, allegations against CBP of abuse, neglect, excessive force and racial profiling have persisted for years, attracting considerable, sustained media coverage and public attention.[27] Furthermore, the nation is engaged in an ongoing, time-

---

[25] *See, e.g.*, Dan Gillmor, *In Praise of the Almost-Journalists*, Slate (Mar. 28, 2014, 12:29 PM), http://slate.me/1jg5YXx (describing national ACLU's efforts to broadly disseminate important civil rights-related news stories) (last visited May 12, 2015).

[26] "ICE Training Documents", *available at* www.michiganimmigrant.org /resources/library (last visited May 12, 2015).

[27] *See, e.g.*, *Editorial: Put Limits on Border Patrol*, BOSTON GLOBE, Jan. 1, 2015, *available at* http://bit.ly/1rI5K2t (last visited May 12, 2015); Ed Pilkington, *Freezing Cells and Sleep Deprivation: The Brutal Conditions Migrants Still Face After Capture*, GUARDIAN, Dec. 12, 2014, *available at* http://bit.ly/1uxlzVi (last visited May 12, 2015); Garrett M. Graff, *The Green Monster: How the Border Patrol Became America's Most Out-of-Control Law Enforcement Agency*, POLITICO, Nov./Dec. 2014, *available at* http://politi.co/1tlB4CS (last

sensitive debate about immigration reform, and the extent to which the activities of Border Patrol should be expanded. Current, comprehensive information about USBP's activities is urgently needed in order to ensure that this debate is based on an accurate understanding of those activities. Yet CBP has consistently failed to turn over information that ought to be made available to the public, and that is necessary to inform public debate.[28] Any discussion of modifying Border Patrol's role as part of immigration reform must be premised on an understanding of Border Patrol's current practices. Given the fast-moving immigration debate, there is an urgent need for the documents requested here.

For all of the foregoing reasons, expedited processing of this Request is warranted and should be granted. Requesters hereby certify that the foregoing is true and correct to the best of their knowledge and belief. 5 U.S.C. § 552(a)(6)(E)(vi); 6 C.F.R. § 5.5(d)(3).

## REQUEST FOR A WAIVER OR LIMITATION OF SEARCH AND REVIEW FEES

The Requesters seek a full waiver of all fees because disclosure of the requested records is in the public interest." *See* 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.").

At a minimum, should a total fee waiver be denied, Requesters seek a waiver of all processing (search and review) fees because the ACLU and MIRC qualify as "representatives of the news media," because Mr. Boyce and Dr. Oglesby qualify as researchers at an educational institution, and because the records are not sought for commercial use. *See* 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("fees should be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by an educational or noncommercial scientific institution; or a representative of the news media"); 6

---

visited May 12, 2015); Carrie Johnson, *Former Border Protection Insider Alleges Corruption, Distortion In Agency*, NPR, Aug. 28, 2014, *available at* http://n.pr/1p9YST8 (last visited May 12, 2015); Andrew Becker, *Border Agency's Former Watchdog Says Officials Impeded His Efforts*, WASH. POST, Aug. 16, 2014, *available at* http://wapo.st/1rNoBnz (last visited May 12, 2015); Andrew Becker, *Removal of Border Agency's Internal Affairs Chief Raises Alarms*, CTR. FOR INVESTIGATIVE REPORTING, June 12, 2014, *available at* http://bit.ly/1v6mRbM (last visited May 12, 2015); Karen McVeigh, *Immigration Groups Allege Abuse of Migrant Minors by US Border Patrol*, GUARDIAN, June 11, 2014, *available at* http://bit.ly/1tqi70g (last visited May 12, 2015); Damien Cave, *Complaints of Abuse by Border Agents Often Ignored, Records Show*, N.Y. TIMES, May 5, 2014, *available at* http://nyti.ms/1BgT7fr (last visited May 12, 2015).
[28] *See Ohio State University Moritz College of Law Civil Clinic et al. v. U.S. Customs and Border Protection*, No. 14-2329 (S.D. Ohio Nov. 18, 2014); *Arizona Civil Liberties Union Foundation of Arizona, Derek E. Bambauer and Jane Yakowitz Bambauer v. U.S. Department of Homeland Security* No. 15-00247 (D.AZ. Feb. 11, 2015); *American Civil Liberties Union of San Diego and Imperial Counties v. United States Department of Homeland Security,* 8:15 CV 00229−JLS−RNB (C.D. Cal., filed Feb. 20, 2015); *Brown, et al. v. USCBP and USDHS*, 15-cv-01181-JD (N.D. Cal. Mar. 12, 2015).

C.F.R. § 5.11(d)(1) (search fees shall not be charged "for requests by educational institutions . . . or representatives of the news media"); *id.* § 5.11(k)(1) ("Records responsive to a request will be furnished without charge or at a charge reduced below that established under paragraph (c) of this section where a component determines, based on all available information, that the requester has demonstrated that (i) disclosure of the requested information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government; and (ii) disclosure of the information is not primarily in the commercial interest of the requester."). As discussed below, federal agencies routinely grant such fee waivers for FOIA requests made by the ACLU and similar organizations for these reasons.

### A. Release of the requested records is in the public interest.

The records requested will contribute significantly to public understanding of the government's operations or activities. Under 6 C.F.R. § 5.11(k)(2), the following factors are to be considered in determining whether a disclosure is in the public interest: (i) whether the subject of the requested records concerns "the operations or activities of the government"; (ii) whether the disclosure is "likely to contribute" to an understanding of government operations or activities; (iii) whether disclosure of the requested information will contribute to "public understanding," that is, "the understanding of a reasonably broad audience of persons interested in the subject"; and (iv) whether disclosure is likely to contribute "significantly" to public understanding of government operations or activities. *See* 6 C.F.R. § 5.11(k)(2)(i)–(iv). Each of these considerations is satisfied here.

First, the records requested pertain directly to the operations and activities of the federal government (specifically, CBP and one of its subcomponents, the U.S. Border Patrol).

Second, this Request is "likely to contribute" to an understanding of government operations or activities, specifically by helping the public understand Border Patrol's immigration enforcement policies and practices, including racial profiling and its' efforts to work with local law enforcement. Given the current debate on comprehensive immigration reform, and ongoing debates over local and state law enforcement's cooperation with federal immigration enforcement, few issues are more important to the public. Border Patrol's practices and procedures regarding racial profiling have received national attention, addressed both by Congress during the drafting of comprehensive immigration reform and by the media due to the advocacy of immigrant rights groups and various lawsuits filed against Border Patrol.[29]

Third, disclosure of the requested information will contribute to "the understanding of a reasonably broad audience of persons interested in the subject" of how individuals detained by USBP are treated while in USBP custody. Among other things, Mr. Boyce and Dr. Oglesby intend to conduct detailed scholarly analysis of the data obtained, in order to assess such factors as the proximity to the border of Border Patrol arrests and what proportion of arrestees are recent

---

[29] *See, e.g.*, Brian Bennett, *Immigration rights groups accuse officials of racial profiling*, L.A. TIMES, Mar 13, 2013; Manuel Valdes, *ACLU Sues Border Patrol Over Alleged Racial Profiling in Pacific Northwest Border*, HUFF. POST, Apr. 27, 2012; Rebekah L. Cowell, *Raleigh church members sue feds, allege racial profiling*, INDY WEEK, Mar. 2, 2011.

border crossers. Moreover, the ACLU and MIRC intend to publish responsive records and develop reports or analyses regarding USBP's enforcement practices.

Finally, disclosure will contribute "significantly" to the public's understanding of U.S. Border Patrol detention policies and practices. As noted, issues surrounding CBP arrest and detention policies and practices have garnered significant and sustained public and media attention, yet much remains unknown about this critical civil and human rights issue.

The Requesters have thus established, "with reasonable specificity[,] that [their] request pertains to operations of the government," and "the informative value of a request depends not on there being certainty of what the documents will reveal, but rather on the requesting party having explained with reasonable specificity how those documents would increase public knowledge of the functions of the government." *Citizens for Responsibility and Ethics in Washington v. Department of Health and Human Services*, 481 F. Supp. 99, 107–109 (D.D.C. 2006).

### B.  The ACLU and MIRC qualify as representatives of the news media.

At a minimum, should a total fee waiver be denied, "fees should be limited to reasonable standard charges for document duplication" because the ACLU and MIRC are "representative[s] of the news media" and the records are not sought for commercial use.  5 U.S.C. § 552(a)(4)(A)(ii)(II).

The ACLU and MIRC both meet the statutory and regulatory definitions of a "representative of the news media" because each is an "entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. 522(a)(4)(A)(ii); 6 C.F.R. § 5.11 (b)(6); *see also Nat'l Security Archive v. Dep't of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989) (finding that an organization that "gathers information from a variety of sources," exercises editorial discretion in selecting and organizing documents, "devises indices and finding aids," and "distributes the resulting work to the public" is a "representative of the news media" for purposes of the FOIA). The ACLU and MIRC are "representatives of the news media" for the same reasons that they are "primarily engaged in the dissemination of information." *See Electronic Privacy Information Center*, 241 F. Supp. 2d at 10–15 (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the news media" for FOIA purposes); *ACLU v. Department of Justice*, 321 F. Supp. 2d at 30 n.5 (finding non-profit public interest group to be "primarily engaged in disseminating information").[30]  Courts have found other organizations whose mission, function,

---

[30] On account of these factors, fees associated with responding to FOIA requests are regularly waived for the ACLU. For example, in May 2012, the Bureau of Prisons granted a fee waiver to the ACLU for a FOIA request seeking documents concerning isolated confinement of prisoners in BOP custody. In March 2012, the Department of Justice Criminal Division granted a fee waiver to the ACLU for a FOIA request seeking records about the government's access to the contents of individuals' private electronic communications. In June 2011, the National Security Division of the Department of Justice granted a fee waiver to the ACLU with respect to a request for documents relating to the interpretation and implementation of a section of the

publishing, and public education activities are similar in kind to the Requesters to be "representatives of the news media." *See, e.g.*, *Judicial Watch, Inc. v. Dep't of Justice*, 133 F. Supp. 2d 52, 53-54 (D.D.C. 2000) (finding Judicial Watch, self-described as a "public interest law firm," a news media requester). Indeed various federal courts have specifically held that the ACLU is a "representative of the news media." *See, e.g.*, *Service Women's Action Network v. Department of Defense*, 888 F. Supp. 2d 282, 287–88 (D. Conn. 2012) (holding that that the national ACLU and ACLU of Connecticut are "representatives of the news media"); *American Civil Liberties Union of Washington v. Department of Justice*, No. C09–0642RSL, 2011 WL 887731, at *10 (W.D. Wash. Mar. 10, 2011) (finding ACLU of Washington to be a "representative of the news media"), *reconsidered in part on other grounds*, 2011 WL 1900140 (W.D. Wash. May 19, 2011).

### C. Mr. Boyce and Dr. Oglesby Qualify as Researchers at an Educational Institution

Geoffrey Alan Boyce is a doctoral candidate in the School of Geography and Development, at the University of Arizona, which is an educational institution. From 2011-2013 he was a National Science Foundation Graduate Research Fellow. He has conducted research supported by the National Science Foundation, the Tinker Foundation, the ConfluenCenter for Creative Inquiry, and the University of Arizona Social and Behavioral Sciences Research Institute. His research work has covered a number of topics, including international relations, transnational migration and U.S. immigration policy. He has had peer-reviewed work published (or accepted for publication) in scholarly journals including: *Geopolitics*; *Area*; *Territory, Politics and Governance*; the *Arizona Journal for Interdisciplinary Studies;* as well as the University of Georgia Press. Mr. Boyce has professional training in qualitative and mixed-methods research; statistical data analysis; and Geographic Information Systems (GIS).

---

PATRIOT Act. In October 2010, the Department of the Navy granted a fee waiver to the ACLU with respect to a request for documents regarding the deaths of detainees in U.S. custody. In January 2009, the CIA granted a fee waiver with respect to the same request. In March 2009, the State Department granted a fee waiver to the ACLU with regard to a FOIA request submitted in December 2008. The Department of Justice granted a fee waiver to the ACLU with regard to the same FOIA request. In November 2006, the Department of Health and Human Services granted a fee waiver to the ACLU with regard to a FOIA request submitted in November of 2006. In May 2005, the U.S. Department of Commerce granted a fee waiver to the ACLU with respect to its request for information regarding the radio-frequency identification chips in United States passports. In March 2005, the Department of State granted a fee waiver to the ACLU with regard to a request regarding the use of immigration laws to exclude prominent non-citizen scholars and intellectuals from the country because of their political views, statements, or associations. In addition, the Department of Defense did not charge the ACLU fees associated with FOIA requests submitted by the ACLU in April 2007, June 2006, February 2006, and October 2003. The Department of Justice did not charge the ACLU fees associated with FOIA requests submitted by the ACLU in November 2007, December 2005, and December 2004. Finally, three separate agencies—the Federal Bureau of Investigation, the Office of Intelligence Policy and Review, and the Office of Information and Privacy in the Department of Justice—did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002.

Dr. Elizabeth Oglesby is an Associate Professor in the School of Geography and Development and the Center for Latin American Studies at the University of Arizona. Dr. Oglesby's research focuses on issues related to immigration, globalization and labor, human rights, and Central America. Dr. Oglesby has published peer-reviewed work in a number of scholarly venues including *Environment and Planning D*; *Space and Polity*; *Geoforum;* and Duke University Press. Dr. Oglesby has also served as editor of the *Central America Report*, a weekly bulletin of economic and political news analysis published by Inforpress Centroamericana in Guatemala City; an associate editor for the *NACLA Report on the Americas*, the largest circulating English-language publication of Latin American affairs; and a correspondent for *Latinamerica Press*, a hemispheric news service based in Lima, Peru.

Beginning in the late 1990s Dr. Oglesby served as a consultant to the Guatemalan Commission for Historical Clarification (Truth Commission) of the United Nations Office of Project Services in Guatemala City, serving as the assistant to the coordinator of the final report, the coordinator of historical and regional context materials, and a member of the writing team of the final report. In 2013, Dr. Oglesby served as an expert witness in the trial of former Guatemalan President Efráin Rios Montt, who was charged with genocide and crimes against humanity for presiding over the deaths of 1,700 Maya in 1982-83. Dr. Oglesby's present research examines the transnational affects of immigration enforcement activity on host and sending communities in Guatemala, Mexico and the United States.

Mr. Boyce and Dr. Oglesby intend to analyze the documents obtained through this FOIA request, and subject the information these contain to spatial and statistical analysis, to examine enforcement patterns; how these may or may not unevenly concentrate on specific regions and populations; and whether or not USBP enforcement activities in the Detroit Sector differ meaningfully from patterns observed in other USBP enforcement sectors. Mr. Boyce and Dr. Oglesby will publish scholarly work based on the analysis conducted on the documents obtained through this FOIA request. This analysis will be relevant to scholars in a number of academic fields who study patterns and practices of immigration and law enforcement in the United States. These fields include geography, anthropology, sociology, criminology, area studies and migration studies.

Both Mr. Boyce and Dr. Oglesby qualify as researchers at an educational institution under the Freedom of Information Act and its implementing regulations. *See* 28 C.F.R. § 16.11(b)(4). Thus, they should not be charged search or review fees for this Request. *Id.*

### D. Disclosure of the information requested is not in the commercial interest of the Requesters.

Disclosure of the information requested is not in the commercial interest of the ACLU, MIRC, Mr. Boyce or Dr. Oglesby.

********************

For the foregoing reasons, a fee waiver or limitation should be granted. A fee waiver would also fulfill Congress's legislative intent in amending FOIA, namely to ensure that the Act

16

is liberally construed in favor of granting waivers for noncommercial requesters and to effectuate disclosure of documents of public importance. *See Judicial Watch Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be liberally construed in favor of waivers for noncommercial requesters." (internal quotation marks and citation omitted)); OPEN Government Act of 2007, Pub. L. No. 110-175, § 2, 121 Stat. 2524 (finding that "disclosure, not secrecy, is the dominant objective of the Act," quoting *Department of Air Force v. Rose*, 425 U.S. 352, 361 (1991)).

Should a total waiver be denied, fees should be "limited to reasonable standard charges for document duplication," as the Requesters are non-profit institutions and educational researchers seeking such records not for a commercial purpose, but rather to disclose such records through the news media, and put them to use for research purposes. 5 U.S.C. § 552(a)(4)(A)(ii)(II). While it is permissible to charge document duplication fees to educational institutions and representatives of the news media, Requesters are seeking documents in an electronic format. Hence there should be no, or at most, negligible document duplication costs.

If a fee waiver is denied, the Requesters are prepared to pay fees up to $100.00. We ask that you inform us first if fees in excess of $100.00 may be charged, though we reserve the right to appeal a denial of fee waivers.

The Requesters certify that the above information is true and correct to the best of the requesters' knowledge. 6 C.F.R. § 5.5(d)(3).

\*\*\*\*\*\*\*\*\*

Pursuant to the applicable statute and regulations, we expect a determination regarding expedited processing within ten (10) days. *See* 5 U.S.C. § 552(a)(6)(E)(ii)(I); 6 C.F.R. § 5.5(d)(4). We further expect your reply to the Request itself within twenty (20) days, as required under 5 U.S.C. § 552(a)(6)(A)(i). If the Request is denied in whole or in part, we ask that you justify all withholdings by reference to specific exemptions to the FOIA. We also ask that you release all segregable portions of otherwise exempt material. In addition, we request that you provide an estimated date on which you will complete the processing of this request. 5 U.S.C. § 552(a)(7)(B). We reserve the right to appeal a decision to withhold any information.

Please furnish the requested records electronically to all of the following:

Geoffrey Boyce
Tel: 520-621-5096
Fax: 520-621-2889
gboyce@email.arizona.edu
School of Geography and Development
The University of Arizona
P.O. Box 210076, Box #2
Tucson, AZ 85721-0076

Elizabeth Oglesby
Tel: 520-626-6559

eoglesby@email.arizona.edu
Center for Latin American Studies
University of Arizona
P.O. Box 210076
Tucson, AZ 85721

Miriam Aukerman
Tel:  616-301-0930
maukerman@aclumich.org
American Civil Liberties Union of Michigan
1514 Wealthy Street, Suite 201
Grand Rapids, MI 49506

Susan Reed
Tel:  269-492-7196
susanree@michiganimmigrant.org
Michigan Immigrant Rights Center
3030 S 9th St Suite 1A
Kalamazoo, MI  49009

Should you need to communicate with us regarding this Request, please contact us by email or phone at the addresses listed above.

Thank you in advance for your prompt assistance.

Sincerely,

Geoffrey Boyce (MDS)

Geoffrey Boyce
School of Geography and Development
The University of Arizona

Miriam Aukerman
ACLU of Michigan

Dr. Elizabeth Oglesby (MJT)

Dr. Elizabeth Oglesby
School of Geography and Development
The University of Arizona

Susan Reed (MJT)

Susan Reed
Michigan Immigrant Rights Center

# EXHIBIT A

**100 Air Mile Zone**



FUNCTIONAL EQUIVALENT U.S. BORDER: 100 AM ZONE

U.S. BORDER

FUNCTIONAL EQUIVALENT BORDER

100 AIR MILE ZONE